## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **RUSSELL S.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No.  3:17-CV-3175-C (BH)** |
| | § | |
| **NANCY A. BERRYHILL,** | § | |
| **COMMISSIONER OF THE SOCIAL** | § | |
| **SECURITY ADMINISTRATION,** | § | |
| | § | |
| **Defendant.** | § | **Referred to U.S. Magistrate Judge** |

### FINDINGS, CONCLUSIONS, AND RECOMMENDATION
### OF THE UNITED STATES MAGISTRATE JUDGE

By *Special Order No. 3-251*, this social security appeal was automatically referred for proposed findings of fact and recommendation for disposition.  Before the Court are *Plaintiff's Opening Brief*, filed April 6, 2018 (doc. 16), *Defendant's Response Brief*, filed May 7, 2018 (doc. 17), and *Plaintiff's Reply Brief* , filed May 29, 2018 (doc. 18).  Based on the relevant filings, evidence, and applicable law, the Commissioner's decision should be **AFFIRMED**.

## I.  BACKGROUND

### A.    Procedural History

Russell S. (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner) denying his claim for disability insurance benefits (DIB) under Title II of the Social Security Act (Act).  (doc. 16 at 1.)[1]  On November 6, 2014, Plaintiff applied for DIB, alleging disability beginning on April 12, 2011. (doc. 11-1 at 93.)  His claim was denied on February 11, 2015, and upon reconsideration on June 3, 2015.  (*Id.* at 25, 124, 130.)  On June 21, 2015, he

---

[1] Citations to the record refer to the CM/ECF system page number at the top of each page rather than the page numbers at the bottom of each filing.

requested a hearing before an Administrative Law Judge (ALJ). (*Id*. at 135.) He appeared and testified at a hearing on June 16, 2016. (*Id*. at 47-91.) On August 19, 2016, the ALJ issued a decision finding that he was not disabled and denying his claim for benefits. (*Id*. at 25-41.)

Plaintiff timely appealed the ALJ's decision to the Appeals Council on October 3, 2016. (*Id*. at 184.) The Appeals Council denied his request for review on September 21, 2017, making the ALJ's decision the final decision of the Commissioner. (*Id*. at 6-9.) Plaintiff timely appealed the Commissioner's decision under 42 U.S.C. § 405(g). (*See* docs. 1; 16.)

**B.**     **Factual History**

**1.**     **Age, Education, and Work Experience**

Plaintiff was born on April 2, 1960, and was 56 years old at the time of the hearing before the ALJ. (doc. 11-1 at 49-50, 56.) He had at least a high school education and could communicate in English. (*Id*. at 40.) He had past relevant work experience as a wafer machine tender and hand grinder. (*Id*. at 39.)

**2.**     **Medical Evidence**

From February 8, 2011 to February 18, 2011, Plaintiff received treatment at Green Oaks Hospital (Green Oaks) for increasing depression and suicidal ideation. (*Id*. at 433.) He reported using methamphetamine at least twice per week, and he felt he was a danger to himself. (*Id*.) He received medication and improved. (*Id*. at 434.) On the day he was discharged, he appeared to be in good spirits, denied feeling hopeless, guilty, or worthless, and he reported that he was "fine" and ready to transition to outpatient treatment. (*Id*.) He was alert and oriented times 3, and he had a constricted affect, mildly dysphoric mood, fairly decent attention to detail, and grossly intact memory. (*Id*. at 434-35.) He denied having suicidal or homicidal thoughts or intent, and his insight

and judgment were fair.  (*Id*. at 435.)  He was diagnosed with major depressive disorder with psychotic features, amphetamine abuse, and a Global Assessment of Functioning (GAF) score of 45.  (*Id*.)

From February 21, 2011 to February 25, 2011, Plaintiff was again treated at Green Oaks due to substance abuse, depression, and suicidal ideation.  (*Id*. at 423.)  He reported that he had been using amphetamines off and on for 20 years.  (*Id*.)  He denied having any hallucinations, delusions, ideas of reference, thought insertion, thought control, thought withdrawal, or anhedonia, and also denied feeling hopeless, helpless, guilty, or worthless.  (*Id*. at 423, 440-41.)  He had no problems with motivation, and his sleep and appetite were reasonably good.  (*Id*.)  Plaintiff was admitted to the day hospital program, which included medication management and group therapy.  (*Id*. at 424.)  He was pleasant and cooperative, got along well with the other patients, and participated willingly in group therapy and milieu activities, but at times appeared to be avoiding them.  (*Id*.)  His depressive symptoms seemed to be under control.  (*Id*.)  He appeared to be clinically stable when he was discharged.  (*Id*. at 423-24.)  Plaintiff planned to follow up with outpatient counseling therapy and medication management following his discharge.  (*Id*. at 424.)  At discharge, he was diagnosed with major depressive disorder with psychotic features, amphetamine abuse, and he had a GAF score of 55.  (*Id*. at 425, 430.)

On April 6, 2011, Plaintiff went to Medicine Associates of Kaufman complaining of cramping in his hands and feet and weakness.  (*Id*. at 409.)  He had increased agitation, severe fatigue and weakness, and overall he was not feeling well.  (*Id*.)  It was noted that he had a history of using methamphetamine, and that he had recently relapsed.  (*Id*.)  He also had a history of hepatitis C, parathyroid disease, and surgery in the past year.  (*Id*.)  He was alert, oriented to person,

place, and time, well-developed, well-nourished, and in no distress, but he exhibited a depressed mood. (*Id*. at 411.) He was diagnosed with cramps and weakness in his hands. (*Id*. at 414.)

From November 2012, to May 2014, Plaintiff received treatment for depression, bipolar disorder, hepatitis C, and bronchitis on several occasions at St. Luke Health Ministries. (*Id*. at 537-43.) In November 2012, he was found to have mood disorder and cognitive deficiencies, parathyroid disease, liver disease, and hepatitis B and C. (*Id*. at 543.) Matthew Glick, D.O., determined that Plaintiff was functionally disabled. (*Id*.) In April 2013, his hepatitis C and liver disease were stable, his depression was improving, but he had fatigue and concentration problems. (*Id*. at 541.) In May 2013, Plaintiff had depression and back pain, but his hepatitis C was stable. (*Id*. at 540.) In August 2013, Dr. Glick's impression was that Plaintiff was bipolar but stable, and his hepatitis C was stable. (*Id*. at 539.) He determined that Plaintiff should continue on his medications and noted that he was disabled. (*Id*.) In November 2013, Plaintiff's mood disorder, hepatitis C, and liver disease were stable. (*Id*. at 538.) Dr. Glick continued with Plaintiff's medications, and opined that he was still disabled due to his bipolar mood disorder. (*Id*.) In May 2014, Plaintiff's mood disorder and hepatitis C were stable on his medications, but he was still found to be disabled due to his bipolar mood disorder. (*Id*. at 537.)

From January 2013 to December 2014, Plaintiff received treatment at Metrocare Services (Metrocare) almost monthly. (doc. 11-2 at 298-366.) His alleged symptoms included depression, anxiety, fatigue, disturbed sleep, and mood swings. (*Id*. at 300, 311, 313-14, 325, 330, 335, 341, 345, 353.) Over the course of his treatment, he was diagnosed with depression, bipolar disorder, and amphetamine dependence. (*Id*. at 302, 320, 323, 330, 353, 356, 359.) He was prescribed Paxil, Buspirone, Lithium, and Wellbutrin. (*Id*. at 311, 314, 320, 325, 330, 335, 339, 341, 353, 363, 366.)

His medications were frequently adjusted, and examiners routinely noted that he had relatively normal mental status examinations. (*Id*. at 311, 314, 319-20, 323, 325, 328-30, 334, 338, 340-41, 347-48, 352-53, 355-56, 358-59, 362-63, 365-66.) He regularly denied substance abuse and suicidal ideation, he was cooperative, there was no evidence of psychosis, and he was organized, had normal thought content, and was fully alert and adequately groomed. (*Id*. at 301, 305-06, 310, 313, 319-20, 322-23, 328-29, 334, 338, 340, 344, 347-48, 352-53, 355-56, 358-59, 362-63, 365-66.) He did have suicidal thoughts at times, however. (*Id*. at 314, 317.) He reported that he relapsed on methamphetamine on February 13, 2013. (*Id*. at 307.)

On April 24, 2013, Plaintiff returned to Green Oaks complaining of depression. (doc. 11-1 at 446, 450.) He stated that he had run out of medication about 4-5 days prior. (*Id*. at 450.) He reported that he had suicidal thoughts because he had applied for disability, could not work in the condition he was in, and he was feeling very depressed. (*Id*. at 446.) If he had an opportunity to commit suicide, he might have done it. (*Id*.) He also reported that he previously attempted to commit suicide by overdosing on methamphetamine. (*Id*. at 446-47.) He had not used methamphetamine in the previous 2 months. (*Id*. at 447.) He had back pain that was at a 7 on the pain scale, and he was anxious, depressed, hopeless, and worried. (*Id*. at 447-48.) His thought processes were disorganized, indecisive, and loose, and his speech was garbled, mumbled, and monotone. (*Id*. at 448.) His memory was impaired, but he was able to comprehend and follow directions, and he had auditory hallucinations. (*Id*.) He also had feelings of hopelessness, helplessness, being trapped, having no purpose in life, and disturbed sleep. (*Id*.) He was given medication, and discharged the following day. (*Id*. at 456.)

On July 11, 2013, Plaintiff was treated at Texas Health Resources (THR) with complaints

of congestion. (*Id*. at 605.) He reported that he had congestion for 1 week, and he also had coughing, sore throat, body aches, and a runny nose. (*Id*.) X-rays were performed on his chest, and he was diagnosed with bronchitis. (*Id*. at 606, 794.)

From December 2013 to April 2016, Plaintiff was seen by Joyce Ratner, M.A., for mental health treatment. (doc. 11-2 at 368-376, 593-605.) She diagnosed him with bipolar disorder and major depressive disorder that was recurrent and severe with psychotic symptoms, and he had a GAF score of 45-50. (*Id*. at 368, 594.)

On March 24, 2014, Plaintiff was admitted to Dallas Regional Medical Center (DRMC) for chest pain. (doc. 11-1 at 468.) It was noted that his past medical history included schizoaffective disorder and hepatitis C. (*Id*.) He underwent a stress test that was negative, and acute coronary syndrome was ruled out. (*Id*.) He also had epigastric pain that was secondary to cholelithiasis and biliary colic, and his cholelithiasis had no evidence of cholecystitis. (*Id*.) He was discharged 2 days later in stable condition. (*Id*. at 468.)

From May 2, 2014 to May 6, 2014, Plaintiff received treatment at Texas Health Presbyterian Hospital (THPH) due to abdominal pain and nausea. (*Id*. at 518, 520.) He had previous episodes of pain over the prior 3 months. (*Id*. at 526.) A CT scan of the pelvis showed an enlarged pancreatic head, and an abdominal ultrasound showed cholelithiasis and minimal gallbladder thickening. (*Id*. at 520.) Charles Iliya, M.D., noted that Plaintiff had a history of methamphetamine use, but he had quit several years ago. (*Id*.) Plaintiff was instructed to follow up with Dr. Iliya to schedule a cholecystectomy in the near future. (*Id*.) He was alert, well-developed, well-nourished, in no acute distress, oriented times 3, and he had a normal affect, normal gait, normal symmetrical reflexes, intact sensation, normal muscle strength, and normal speech. (*Id*. at 524, 531.) Upon discharge, he

6

was diagnosed with acute biliary pancreatitis, chronic hepatitis C, elevated LFTs, bilateral renal cysts, gallstones, and depression. (*Id.* at 518.)

On May 2, 2014, and May 25, 2014, Plaintiff received treatment at THR for abdominal pain and nausea. (*Id.* at 568, 576.) Plaintiff stated that he had gallstones and chronic gallbladder disease, but he had been unable to afford surgery. (*Id.*) He denied having fever, chills, vomiting, diarrhea, or urinary symptoms. (*Id.*) He tested positive for methamphetamine and cannabinoids. (*Id.* at 566.) He was awake, alert, and oriented times 3, with grossly intact cranial nerves, no focal deficits, and no lateralizing signs. (*Id.* at 569, 578.) He was diagnosed with acute biliary pancreatitis, chronic hepatitis C, anxiety disorder, depression, chronic fatigue, gallstones, and elevated LFTs. (*Id.* at 571, 579, 592.) Plaintiff was eventually discharged in stable condition, and his abdominal pain was improved. (*Id.* at 572, 596.)

On May 29, 2014, Plaintiff arrived at Baylor University Medical Center (Baylor) by ambulance with complaints of abdominal pain and nausea. (doc. 11-2 at 229-230.) He was in no acute distress, uncomfortable, agitated, alert, anxious, awake, well-developed, well-groomed, well-hydrated, and well-nourished. (*Id.* at 230.) The following day, Plaintiff underwent a laproscopic cholecystectomy with inoperative cholangiogram. (doc. 11-2 at 225, 227, 235, 240-41.) There were no complications ,and he tolerated the procedure well. (*Id.* at 235, 240-41.) He retained a gallstone in his distal common duct. (*Id.* at 248.) He was discharged on June 1, 2014. (*Id.* at 249.)

On June 5, 2014, Plaintiff returned to THR for abdominal pain. (*Id.* at 31-32.) It was noted that he had previously been seen at Parkland Hospital and other facilities for the same symptoms. (*Id.*) He had no other symptoms, concerns, or modifying factors. (*Id.* at 32.) He was alert, oriented times 3, active and cooperative, and he appeared to be distressed due to pain, but he was not

confused, nervous, or anxious.  (*Id*. at 34-35.)

On August 21, 2014, Plaintiff presented to Turtle Creek Manor for mental health and substance abuse treatment.  (*Id*. at 271, 275-76, 280, 285-86, 288.)  He reported that he had used methamphetamine daily for the past 26 years, and he was unable to stop on his own.  (*Id*. at 277.)  He had been extremely troubled by his drug use in the past 30 days, and treatment was extremely important to him.  (*Id*. at 279.)  He also reported that he had thoughts of committing suicide, made plans to commit suicide, and attempted suicide, and he reported that he had homicidal thoughts but had never made specific plans with intent to commit homicide or attempted to commit homicide.  (*Id*. at 280.)  He exhibited good eye contact, his grooming was good, his appearance was normal, he was cooperative during the interview, he showed no signs of intoxication, and his behavior and speech were normal.  (*Id*.)  He was diagnosed with amphetamine dependence, cannabis dependence, and alcohol abuse; he was a carrier of hepatitis B and C; and he had a GAF score of 43.  (*Id*. at 282.)

On September 2, 2014, Plaintiff presented to Parkland Hospital (Parkland) complaining of shoulder pain.  (*Id*. at 379.)  He reported that he sustained the injury in an altercation, and he had pain when he moved his arm upward.  (*Id*. at 380.)  He was oriented to person, place, and time, well-developed, well-nourished, and had normal mood and affect.  (*Id*. at 381.)  An x-ray on his right shoulder showed acromioclavicular joint moderate degenerative changes and mild glenohumeral joint degenerative changes, but no fractures or dislocations.  (*Id*. at 398.)  He was diagnosed with shoulder pain, substance abuse, and mood disorder, and prescribed medication.  (*Id*. at 381.)

On December 30, 2014, Plaintiff returned to Parkland for shoulder pain and a neck injury.  (*Id*. at 385.)  He reported that he never picked up his medication after his last visit.  (*Id*.)  He was oriented to person, place, and time, well-developed, well-nourished, alert, and he had normal mood

8

and affect.  (*Id*. at 387.)  He was again prescribed medication for his pain.  (*Id*.)

On January 14, 2015, Plaintiff went to Parkland complaining of ongoing numbness, tingling, and pain in his right arm.  (*Id*. at 401-02.)  X-rays showed moderate degenerative changes.  (*Id*. at 402.)  His physical examination was normal, and he was diagnosed with right shoulder pain and reactive hepatitis C, and the examiner discussed pre-diabetes and the increased risk of developing diabetes with him.  (*Id*. at 403-04.)

On February 5, 2015, Plaintiff had a follow-up appointment at Metrocare.  (*Id*. at 442.)  He exhibited poor insight, but was adequately groomed, alert, oriented times 3, and cooperative, with goal directed thoughts, restricted affect, and a fully oriented and intact memory.  (*Id*.)  He was not suicidal or homicidal.  (*Id*. at 443.)  He reported that he had been becoming irritable and he was not sleeping well.  (*Id*.)  Although he still had some anxiety and trouble falling asleep, he thought the medications were helping him.  (*Id*.)  He also reported that he had not used methamphetamine in the past 6 months.  (*Id*.)  He was diagnosed with bipolar disorder and amphetamine dependance in early full remission, and his medications were adjusted.  (*Id*.)

On May 1, 2015, Plaintiff had another follow-up at Metrocare.  (*Id*. at 451.)  He stated that he had been kind of depressed, and his insight was poor.  (*Id*.)  His behavior was cooperative, psychomotor activity was appropriate, memory was intact, attention was normal, and his judgment was fair.  (*Id*.)  He was also alert, oriented times 3, and adequately groomed.  (*Id*.)  He was not suicidal or homicidal.  (*Id*. at 452.)  He was again diagnosed with bipolar disorder and amphetamine dependence in early remission, and his medications were adjusted.  (*Id*.)

On May 5, 2015, Plaintiff was seen at Parkland due to neck pain and right arm paresthesias.  (*Id*. at 554.)  He was alert, cooperative, and in no apparent distress, but an examination showed

shoulder impingement signs on the right side.  (*Id*. at 555.)

On May 29, 2015, Blaine Carr, Ph.D., a state agency psychological consultant (SAPC) completed a mental residual functional capacity (RFC) assessment of Plaintiff based on the medical evidence.  (doc. 11-1 at 115-17.)  Dr. Carr opined that Plaintiff was markedly limited in his ability to understand and remember detailed instructions, but not significantly limited in the remaining areas of understanding and memory.  (*Id*. at 115-16.)  She found that Plaintiff was markedly limited in his ability to carry out detailed instructions, moderately limited in his ability to maintain attention and concentration for extended periods, moderately limited in his ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms and perform at a consistent pace without an unreasonable number and length of rest breaks, and not significantly limited in the remaining areas of sustained concentration and persistence.  (*Id*. at 116.)  She also found that he had no social interaction or adaptation limitations.  (*Id*.)  Plaintiff could understand, remember, and carry out simple instructions, make simple decisions, attend and concentrate for extended periods, interact adequately with coworkers and supervisors, and respond appropriately to changes in a routine work setting.  (*Id*. at 117.)

On June 9, 2015, Plaintiff returned to Parkland complaining of chronic lower back pain and right shoulder pain.  (doc. 11-2 at 560-61.)  He also had complaints regarding his blood pressure and weight gain.  (*Id*.)  He was oriented to person, place, and time, well-developed, well-nourished, and alert.  (*Id*. at 562.)  He exhibited decreased range of motion and decreased strength in his right shoulder, and decreased range of motion in his lumbar back.  (*Id*.)  His blood pressure was 147/94.  (*Id*.)  He was diagnosed with hypertension, shoulder pain, and chronic back pain.  (*Id*.)  An MRI on his right shoulder showed rotator cuff tendinosis and tears suggestive of a type III SLAP tear, and

severe acromioclavicular osteoarthrosis. (*Id*. at 566.) An MRI on his lumbar spine revealed minimal retrolisthesis of L3 and L4, anterolisthesis of L4 and L5, mild to moderate degenerative disease at L3-L4 and L4-L5, and mild to moderate facet arthropathy at L4-L5 and L5-S1. (*Id*. at 569.)

On July 24, 2015, September 25, 2015, and November 12, 2015, Plaintiff returned to Metrocare for scheduled appointments. (*Id*. at 574, 576, 580.) At his first appointment, he was stable on his medications, and denied having suicidal or homicidal ideation. (*Id*. at 574.) At his second appointment, he was adequately groomed, cooperative, depressed, alert, and oriented times 3, with appropriate psychomotor activity, restricted affect, intact memory, poor insight, and fair judgment. (*Id*. at 576.) He reported depression, jumpiness at night, some fleeting suicidal ideation without a plan or intent, no hallucinations, and no paranoia. (*Id*. at 577.) He was diagnosed with bipolar disorder, amphetamine abuse in early remission, and ETOH abuse, and his medications were adjusted. (*Id*.) His mental status examination at his third appointment was the same as his second appointment, except his mood was "alright". (*Id*. at 580.) His diagnoses remained the same, and his medications were adjusted again. (*Id*. at 581.)

On November 30, 2015, Plaintiff underwent psychosocial rehabilitation at Metrocare. (*Id*. at 584.) He was oriented times 4, behaved well, appeared well, and denied suicidal or homicidal ideation and alcohol or drug use. (*Id*.) He reported that he was feeling better since his prior session and did not feel as depressed, but he still had issues interacting with crowds of people. (*Id*.)

On February 15, 2016, Plaintiff had a follow-up at Metrocare, and he was adequately groomed, cooperative, alert, and oriented times 3, with appropriate psychomotor activity, no delusions, pessimistic mood, restricted affect, intact memory, normal attention, poor insight, and fair

judgment. (*Id*. at 587.) He was not suicidal or homicidal. (*Id*. at 588.) He was no longer having muscle changes since his medications were changed, and he was sleeping better on Remeron. (*Id*.) His mood had been more irritable recently, and he denied recent alcohol or drug use. (*Id*.) He was diagnosed with bipolar disorder, anxiety, amphetamine dependence in early remission, and alcohol abuse, and his medications were adjusted. (*Id*.)

On June 1, 2016, Kathryn Sickorez, M.D., a treating source at Metrocare, completed a medical source statement for Plaintiff. (*Id*. at 608-610.) Dr. Sickorez opined that Plaintiff had extreme loss in his abilities to perform at a consistent pace without an unreasonable number and length of rest breaks, respond appropriately to changes in a routine work setting, and cope with normal work stress without exacerbating pathologically based symptoms. (*Id*. at 608-09.) She opined that he had substantial loss in his abilities to understand and carry out detailed but uninvolved written or oral instructions, demonstrate reliability by maintaining regular attendance and being punctual within customary tolerances, maintain concentration for an extended period of 2 hours, maintain attention and stay on task for an extended period, make simple work-related decisions, ask simple questions or request assistance, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes, behave in an emotionally stable manner, and finish a normal work week without interruption from psychologically based symptoms. (*Id*.) She further opined that he had some loss in his abilities apply commonsense understanding to carry out simple one or two-step instructions, act appropriately with the general public, and maintain his personal appearance. (*Id*.) She noted that his designated signs of mental illness included crying spells, low energy, difficulty thinking or confusion, chronic depression, chronic mood disturbance, sleep disturbance,

hallucinations or delusions, and anger outbursts.  (*Id*. at 609.)  She also noted that his impairments

or symptoms would cause him to be absent from work about 4 days per month.  (*Id*. at 610.)  She

found that his mental impairments were severe enough to produce the limitations she noted, and that

his mental disorders probably exacerbated the degree of disability he experienced from his physical

impairments.  (*Id*.)

### 3.    Hearing Testimony

On June 16, 2016, Plaintiff and a vocational expert (VE) testified at a hearing before the

ALJ.  (doc. 11-1 at 47-91.)  Plaintiff was represented by an attorney.  (*Id*. at 47-49.)

#### a.    *Plaintiff's Testimony*

Plaintiff testified that he was born on April 2, 1960, and he lived at his mother's house.  (*Id*.

at 56-57.)  He had a driver's license and no limits on his ability to drive.  (*Id*. at 57.)  He dropped

out of school in ninth grade but completed his GED.  (*Id*. at 57-58.)  After he left school, he was in

a work program making optical parts.  (*Id*. at 58.)  In 2001, he worked for a company making optical

parts to go into systems.  (*Id*. at 58-59.)  In 2005, he worked as an optical technician at Wal-Mart

for 2 months.  (*Id*. at 59.)  In 2006, he began working for a company as a machine operator but was

let go in 2011.  (*Id*. at 59-61.)  He had not worked again since.  (*Id*. at 61.)

Plaintiff stated that he had not used methamphetamine since August 2014.  (*Id*. at 63, 65.)

Between 2011 and August 2014, his drug use went from extreme to social on weekends, and then

to him using every 2-3 weeks.  (*Id*. at 64.)  He had not used alcohol when he was using

methamphetamine.  (*Id*. at 64.)  He had not used any drugs at all since August 2014, and he had

drank only two times, in 2014 and 2015.  (*Id*. at 65.)  He attended group meetings at Turtle Creek

Manor until October or November 2014, and then he began to attend group meetings almost daily

at Metrocare.  (*Id*. at 66, 72-73.)

Plaintiff stated that he was unable to work due to trouble thinking, depression, panic attacks, and anxiety.  (*Id*. at 62-63, 67.)  His anxiety issues made it difficult for him to fill out an application, and he did not think he could sit for an interview.  (*Id*. at 67.)  He could not converse very well, and he felt that his overall mental health was weak.  (*Id*.)  His medications were not enough to help with his anxiety and panic attacks, and he requested more medication when he went to the doctor.  (*Id*. at 68.)  He was always fidgety and did not sleep well.  (*Id*.)  He took Wellbutrin for anxiety as well as blood pressure medication, Lithium, Buspirone, Remeron, and Buspar.  (*Id*. at 68, 74.)  His panic attacks and anxiety would become worse if things were not going right when he was trying to perform a task, and at times he would be manic the whole day.  (*Id*. at 68-69.)  He was also bipolar. (*Id*. at 69.)  He felt that he did not "have much time left."  (*Id*.)  He also had issues with his right shoulder.  (*Id*. at 70.)  He had hurt it a few years prior, but he had not had any type of surgery.  (*Id*.) His shoulder hurt all the time, and he could not use his right side at all, even though he was right-handed.  (*Id*. at 71.)

Plaintiff saw Dr. Ratner for 1 hour every couple of weeks for therapy, and he would talk about family issues, personal issues, and events.  (*Id*. at 74.)  When he went to Metrocare, he reported that he was not doing well because he was manic all the time and unhappy.  (*Id*. at 75.)  He was still having sleep problems, and slept maybe 3 hours per night.  (*Id*.)  During the day, he would help his mother with yard work and would go to the store 5-6 times a day for her.  (*Id*. at 76.)  He would weigh himself or check his blood pressure at the store, or just go any time his mother asked. (*Id*.)  He had been overeating while on his medications and had gained 60 pounds.  (*Id*. at 76-77.)

Plaintiff stated that he had a hard time focusing on things, and he would sit to try to watch

television but could not sit for very long. (*Id.* at 77.) He could not sit through a whole show, and it took him all day to watch a movie because of his anxiety. (*Id.* at 77-78.) When he became anxious, he would get depressed, sweaty, and feel sick, like he was going to throw up. (*Id.* at 78.) He had one child and two grandchildren, and he would call them all of the time because he felt out of control. (*Id.* at 79.) He would sometimes attend his grandchildrens' baseball and football games. (*Id.* at 80.) His attorney pointed out that he was very fidgety during the hearing, and Plaintiff stated that his therapist would tell him that he would ramble so much at times that she could not understand him. (*Id.*)

### b.   VE's testimony

The VE testified that Plaintiff had the following past work experience: wafer machine tender, DOT 673.685-102 (SVP 2, light); and hand grinder, DOT 716.685-018 (SVP 2, light). (*Id.* at 82.)

The ALJ asked the VE to consider a hypothetical individual of the same age, education, and work history as Plaintiff who had no exertional limitations, and who could understand, remember, and carry out simple tasks and instructions, and have no more than occasional interaction with coworkers, supervisors, and the public. (*Id.*) The ALJ asked if the hypothetical individual could perform any of Plaintiff's past work. (*Id.*) The VE opined that the hypothetical individual could perform both of Plaintiff's past jobs. (*Id.* at 82-83.)

The ALJ then asked if the hypothetical individual could perform any other work available in the national economy. (*Id.* at 83.) The VE responded that the individual could perform other work as a small products assembler, DOT 706.684-022 (SVP 2, light), with 7,500 jobs in Texas and 125,200 jobs nationally; an automobile detailer, DOT 915.687-034 (SVP 2, medium), with 30,000 jobs in Texas and 310,000 jobs nationally; and an electronics worker, DOT 726.687-010 (SVP 2,

light), with 8,200 jobs in Texas and 101,000 jobs nationally.  (*Id.*)

The ALJ next asked the VE to consider a hypothetical individual that had the same limitations as the first individual, except the second hypothetical individual was limited to medium level work and frequent handling and reaching with the dominant upper extremity.  (*Id.* at 83.)  The ALJ asked if this individual could perform any of Plaintiff's past work.  (*Id.* at 83-84.)  The VE responded that the individual could perform both of Plaintiff's past jobs.  (*Id.* at 84.)  The ALJ then asked if the second hypothetical individual could perform other work available in the national economy.  (*Id.*)  The VE responded that the individual could perform the jobs identified for the first hypothetical.  (*Id.*)

The ALJ asked the VE to consider a third hypothetical individual just like the second hypothetical individual, except the third individual would be off task approximately 10 percent of the workday above and beyond normal breaks and the lunch period.  (*Id.*)  The ALJ asked if this third hypothetical individual could perform any of Plaintiff's past work.  (*Id.*)  The VE responded that the individual could not.  (*Id.* at 84-85.)  The ALJ then asked if the individual could perform other work available in the national economy, and the VE responded that he could not.  (*Id.* at 85.)

Plaintiff's attorney asked the VE to consider the first hypothetical individual, with additional limitations for an individual who had a substantial loss of ability—defined as being able to work only in a sheltered work setting where special considerations and attentions were provided—and who could maintain attention for two-hour segments and stay on task for two-hour segments.  (*Id.*)  He asked if such limitations would affect the individual's ability to perform past work or the other jobs that were identified.  (*Id.* at 85-86.)  The VE stated that those limitations would rule out competitive employment.  (*Id.* at 86.)

16

Plaintiff's attorney next asked the VE to consider the first hypothetical individual again, but the individual would have a substantial loss in ability to accept instructions and respond appropriately to criticism from supervisors. (*Id*.) The VE stated that the individual would be precluded from maintaining competitive employment. (*Id*.)

Plaintiff's attorney asked if the first hypothetical individual would be able to perform past work or other work if he had a substantial loss in the ability to get along with coworkers or peers without unduly distracting them or exhibiting personal experiences. (*Id*.) The VE responded that those limitations would eliminate the individual's ability to maintain competitive employment. (*Id*.)

Plaintiff's attorney then asked what the level of tolerance would be if the hypothetical individual were to miss more than 2 days of work per month. (*Id*. at 86-87.) The VE responded that it would not be tolerated for Plaintiff's past work or the other jobs that were identified. (*Id*. at 87.) He then asked if there would be any distinction if the individual left work early on a regular basis instead of missing the whole day. (*Id*.) The VE responded that there was no distinction, and the individual would still be precluded from maintaining competitive employment. (*Id*.)

Lastly, Plaintiff's attorney asked the VE if she would have sufficient information to determine whether or not an individual could perform work if she were only told that the individual were moderately limited in his ability to maintain concentration and attention. (*Id*. at 88.) The VE responded that she would not be able to answer without more information. (*Id*. at 88-89.) The VE stated that her testimony was consistent with the DOT. (*Id*. at 89.)

## C.    **ALJ's Findings**

The ALJ issued his decision denying benefits on August 19, 2016. (*Id*. at 25-41.) At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since April 12, 2011,

17

the alleged onset date. (*Id*. at 28.) At step two, the ALJ found that he had the following severe impairments: amphetamine dependence, major depressive disorder, bipolar disorder, torn rotator cuff, and osteoarthritis in his right shoulder. (*Id*.) Despite those impairments, at step three, the ALJ found that Plaintiff had no impairment or combination of impairments that met or equaled the severity of one of the impairments listed in the social security regulations. (*Id*. at 32.)

Next, the ALJ determined that Plaintiff retained the RFC to perform medium work, except he could understand, remember, and carry out simple tasks and instructions. (*Id*. at 34.) He further determined that Plaintiff required no more than occasional interaction with coworkers, supervisors, and the public, and that he could frequently use his dominant upper extremity for handling and reaching. (*Id*.)

At step four, the ALJ determined that Plaintiff could perform his past relevant work as a wafer machine tender and hand grinder because this work did not require the performance of work-related activities that were precluded by his RFC. (*Id*. at 39.) Although the ALJ found that Plaintiff was capable of performing his past relevant work, the ALJ continued to step five and relied on the VE's testimony to find Plaintiff capable of performing work that existed in significant numbers in the national economy, including jobs such as a small products assembler, auto detailer, and electronics worker. (*Id*. at 40-41.) Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined by the Social Security Act, from April 12, 2011, through August 19, 2016. (*Id*. at 41.)

## II.  LEGAL STANDARDS

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner

applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g), 1383(C)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). The relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are also identical to those governing the determination under a claim for supplemental security income. *See id*. Courts may therefore rely on decisions in both areas without distinction in reviewing an ALJ's decision. *See id*.

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563–64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v.*

*Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1.  An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.  An individual who does not have a "severe impairment" will not be found to be disabled.

3.  An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4.  If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5.  If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)). Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id*. Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis.

*Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

### III.  ISSUES FOR REVIEW

Plaintiff presents two issues for review:

1.     Drug and Alcohol Abuse is only material when a medical source diagnoses a substance use disorder and the claimant is found disabled when DAA is included.  Did the Administrative Law Judge fail to follow the procedural guidelines when he rejected Dr. Sickorez'[s] medical opinion because she did not discuss the impact his alcohol use had on his mental functioning?

2.     Uncorroborated hearsay—such as the opinions of State Agency Medical Consultants—may constitute substantial evidence supportive of an adverse disability finding when a claimant has not exercised his right to subpoena and cross-examine the physician. [Plaintiff] objected to the State Agency doctors' reports, and asked the Administrative Judge to subpoena them for the opportunity of cross-examination.  Does substantial evidence support the Commissioner's decision if the ALJ denied the subpoena and relied on the reports when determining [Plaintiff's] mental residual functional capacity?

(doc. 16 at 1, 8, 10.)

### IV. RFC ASSESSMENT[2]

Plaintiff argues that the ALJ's RFC assessment is not supported by substantial evidence.

(doc. 16 at 10, 14.)

Residual functional capacity, or RFC, is defined as the most that a person can still do despite recognized limitations. 20 C.F.R. § 404.1545(a)(1).  The RFC determination is a combined "medical assessment of an applicant's impairments with descriptions by physicians, the applicant, or others of any limitations on the applicant's ability to work." *Hollis v. Bowen*, 837 F.2d 1378, 1386–87 (5th Cir. 1988) (per curiam).  The relevant policy interpretation regarding the RFC determination states:

    1. Ordinarily, RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A "regular and continuing basis" means 8 hours a day, for 5 days

---

[2] Because both of Plaintiff's issues implicate the ALJ's RFC assessment, they will be considered together.

a week, or an equivalent work schedule.

2. The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments, including the impact of any related symptoms. . . .

SSR 96–8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996).  The ALJ "is responsible for assessing the medical evidence and determining the claimant's residual functional capacity."  *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985).

Determination of an individual's RFC should be based on all of the relevant evidence in the case record, including opinions submitted by treating physicians or other acceptable medical sources. 20 C.F.R. § 404.1545(a)(3); SSR 96-8p, 1996 WL 374184, at *1.  Every medical opinion is evaluated regardless of its source, but the Commissioner generally gives greater weight to opinions from a treating source.  20 C.F.R. § 404.1527(c)(2).  A treating source is a claimant's "physician, psychologist, or other acceptable medical source" who provides or has provided a claimant with medical treatment or evaluation, and who has or has had an ongoing treatment relationship with the claimant.  *Id.* § 404.1502.  When "a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence," the Commissioner must give that opinion controlling weight.  *Id.* § 404.1527(c)(2).[3]

_____

[3] If controlling weight is not given to a treating source's opinion, the Commissioner considers six factors in deciding the weight given to each medical opinion: (1) whether the source examined the claimant or not; (2) whether the source treated the claimant; (3) the medical signs and laboratory findings that support the given opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the opinion is made by a specialist or non-specialist; and (6) any other factor which "tend[s] to support or contradict the opinion."  *See id.* § 404.1527(c)(1)–(6).  The "standard of deference to the examining physician is contingent upon the physician's ordinarily greater familiarity with the claimant's injuries. . . . [W]here the examining physician is not the claimant's treating physician and where the physician examined the claimant only once, the level of deference afforded his opinion may fall correspondingly." *Rodriguez v. Shalala*, 35 F.3d 560, 1994 WL 499764, at *2 (5th Cir. 1994) (unpublished) (citing *Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir. 1990)).  A treating physician's opinion may also be given little or no weight when good cause exists, such as "where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical,

While an ALJ should afford considerable weight to opinions and diagnoses of treating physicians when determining disability, sole responsibility for this determination rests with the ALJ. *Newton*, 209 F.3d at 455. The ALJ's RFC decision can be supported by substantial evidence even if she does not specifically discuss all the evidence that supports her decision or all the evidence that she rejected. *Falco v. Shalala*, 27 F.3d 160, 163–64 (5th Cir. 1994). A reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the court would reach a different conclusion based on the evidence in the record. *Leggett*, 67 F.3d at 564. Nevertheless, the substantial evidence review is not an uncritical "rubber stamp" and requires "more than a search for evidence supporting the [Commissioner's] findings." *Martin v. Heckler*, 748 F.2d 1027, 1031 (5th Cir. 1984) (citations omitted). The Court "must scrutinize the record and take into account whatever fairly detracts from the substantiality of the evidence supporting the" ALJ's decision. *Id*. Courts may not reweigh the evidence or substitute their judgment for that of the Secretary, however, and a "no substantial evidence" finding is appropriate only if there is a "conspicuous absence of credible choices" or "no contrary medical evidence." *See Johnson*, 864 F.2d at 343 (citations omitted).

Here, before proceeding to step four, the ALJ determined that Plaintiff had the RFC to perform medium work, except that he could understand, remember, and carry out simple tasks and instructions, required no more than occasional interaction with coworkers, supervisors, and the public, and could frequently use his dominant upper extremity for handling and reaching. (doc. 11-1 at 34.) In making the RFC determination, the ALJ considered Plaintiff's allegations, those of his mother, the medical evidence, Dr. Sickorez's treating source statement, Dr. Carr's assessment, and

---

laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence." *Newton v. Apfel*, 209 F.3d 448, 456 (5th Cir. 2000). If the evidence supports a contrary conclusion, an opinion of any physician may be rejected. *Id.* at 455; *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1981) (per curiam).

the other opinion evidence of record. (*Id.* at 35-39.)

The ALJ gave only partial weight to Dr. Sickorez's medical source statement. (doc. 11-1 at 37.) He first found that Dr. Sickorez's findings conflicted with Plaintiff's "longitudinal treatment notes that routinely reflect[ed] normal behavior." (*Id.*) He then noted that Plaintiff reported that he could "independently complete personal care, shop in stores, navigate public transportation, operate a motor vehicle, attend his grandchildren's baseball or football games, mow the grass, and count change." (*Id.*) He further noted that Dr. Sickorez's assessment was "vague and quite conclusory because she did not address [Plaintiff's] extensive drug use during the relevant period, which could be [a] factor in [the] limitations" in her statement. (*Id.*) Regardless of her failure to address Plaintiff's drug use, the ALJ ultimately "accounted for Dr. Sickorez's suggested limitations that [were] supported by the record in forming" Plaintiff's RFC. (*Id.*)

The ALJ gave partial weight to Dr. Carr's findings that Plaintiff had no episodes of decompensation, mild restrictions in activities of daily living, mild difficulties in social functioning, and moderate restrictions in maintaining concentration, persistence, or pace because they were grounded in the evidence of record. (*Id.* at 38.) The ALJ gave little weight to her opinions to the extent they differed from his assessments because her opinions were based only on the part of the record that was before her at the time of her report. (*Id.*) "Dr. Carr did not have the benefit of reviewing all the evidence received at the hearing level prior to making her assessments." (*Id.*)

## A.    <u>Drug and Alcohol Use</u>

Plaintiff first argues that by rejecting Dr. Sickorez's opinions for failure to expressly address the impact of drug and alcohol use on his functioning, the ALJ circumvented the law and violated Social Security Ruling 13-2p. (docs. 16 at 9-10; 18 at 1-2.)

Under 20 C.F.R. § 404.1535, if a claimant is found disabled and there is medical evidence of drug addiction or alcoholism, the ALJ "must determine whether [the] drug addiction or alcoholism is a contributing factor material to the determination of disability." SSR 13-2p explains the Commissioner's policy for "consider[ing] whether 'drug addiction and alcoholism' (DAA) is material to [the] determination of disability in disability claims and continuing disability reviews." SSR 13-2p, 2013 WL 603764, at *11939. It provides, in relevant part, that a DAA materiality determination is made only when: (1) there is "medical evidence from an acceptable medical source establishing that a claimant has a Substance Abuse Disorder," *and* (2) the claimant is found to be "disabled considering all impairments, including the DAA." *Id*. at *11941 (emphasis added). "The regulations expressly require that a *prima facie* finding of disability be made by the ALJ *prior* to considering the DAA issue." *Oettinger v. Barnhart*, No. 01-CA-0801-OG-NN, 2002 WL 31422308, at *5 (W.D. Tex. Sept. 4, 2002) (emphasis in original). "In other words, DAA becomes an issue in a social security claim for benefits only after the ALJ finds the claimant disabled." *Id*. It is error for an ALJ to consider "drug and alcohol use without a finding of disability." *Pena v. Carolyn, Acting Comm'r of Soc. Sec. Admin.*, No. H-13-1486, 2014 WL 12540442, at *6 (S.D. Tex. June 12, 2014).

In *Campanile v. Astrue*, No. 10-716-JJB-CN, 2012 WL 1424728, at *3 (M.D. La. March 19, 2012), the ALJ injected information regarding the plaintiff's DAA into her determination of whether the plaintiff's impairments met or equaled a listed impairment, and "in her analysis of plaintiff's RFC determination." The ALJ noted that the plaintiff had a "serious substance abuse problem," and tested positive for several drugs she was not prescribed. *Id*. The court noted that although a plaintiff bears the burden of proving that DAA is not a contributing factor material to the disability

25

determination, this "burden only arises after the ALJ determines whether the claimant is disabled." *Id*. The court concluded that the ALJ erred because she "did not exclude the presence of plaintiff's drug and alcohol abuse before making her determination of plaintiff's disability status," and reversal was warranted for failure to apply the correct legal standard. *Id*. at 3–4; *see also Pena*, 2014 WL 12540442, at *4–6 (relying on *Campanile* in determining that the ALJ erred "by repeatedly referencing and relying on [the plaintiff's] drug use in determining . . . that [he] was not disabled.").

Here, as noted, the ALJ considered Dr. Sickorez's opinion in determining Plaintiff's RFC but noted that "she did not address [Plaintiff's] extensive drug use during the relevant time period . . . ." (doc. 11-1 at 37.) Although the ALJ indicated that consideration of Plaintiff's drug use could have factored into the limitations in Dr. Sickorez's statement, he specifically still "fully accounted for Dr. Sickorez's suggested limitations that [were] supported by the record" in forming Plaintiff's RFC. (*Id*.) The ALJ also discussed all of the relevant evidence in the record in making his RFC determination, and he did not discuss Plaintiff's drug or alcohol use in any other portion of his RFC determination. (*See id*. at 34-39.) While he noted that Dr. Sickorez did not address Plaintiff's drug use, it appears the ALJ only discounted her opinions because they conflicted with the treatment notes of record and with Plaintiff's own stated functional abilities. (*Id*. at 37.) Regardless of her failure to address Plaintiff's drug use, the ALJ still gave her opinions partial weight to the extent they were supported by the evidence of record. (*Id*.) The ALJ did not consider Plaintiff's drug and alcohol use in making his RFC determination when he only noted that Dr. Sickorez did not address Plaintiff's drug use because he still gave her opinions partial weight to the extent they were supported by the evidence, and he considered the entire record in making his RFC determination without any more consideration of DAA. Accordingly, the ALJ did not fail to apply the correct legal

standard, and remand is not required on this issue.

**B.**    **Opportunity for Cross-Examination**

Plaintiff argues that the ALJ erred and denied him his fundamental due process rights because he did not allow him to cross-examine Dr. Carr, and therefore substantial evidence does not support his decision that is based in part on Dr. Carr's opinion.  (docs. 16 at 10-14; 18 at 7-8.)

In *Richardson v. Perales*, 402 U.S. 389, 402 (1971), the Supreme Court held that written reports of physicians that examined the claimant, despite their hearsay character, "may constitute substantial evidence . . . when the claimant has not exercised his right to subpoena the reporting physician and thereby provide[d] himself with the opportunity of cross-examination of the physician."  The Fifth Circuit has interpreted this to mean that when a claimant exercises the right to subpoena, "a claimant has the right to cross-examine an *examining* physician."  *Lidy v. Sullivan*, 911 F.2d 1075, 1077 (5th Cir. 1990) (emphasis added).  This right does not extend to *non-examining* physicians, however.  *Barrett v. Berryhill*, 906 F.3d 340, 343–45 (5th Cir. 2018) (establishing that there is no right to question non-examining medical consultants); *see Hooton*, 2017 WL 4081459, at *2 (citing cases recognizing that "no right exists for claimants to subpoena non-examining physicians"); *Carroll v. Massanari*, No. 500CV0267C, 2001 WL 406227, at *4 (N.D. Tex. Apr. 17, 2001), *adopted by* 2001 WL 506979 (N.D. Tex. May 10, 2001) (citing *Lidy*, 911 F.2d 1075) (finding that although the right to subpoena examining physicians is automatic, this right does not extend to non-examining physicians).  "The proper standard when considering whether to issue a subpoena to a non[-]examining physician is whether 'it is reasonably necessary for the full presentation of a case.'"  *Carroll*, 2001 WL 406227, at *4 (citing 20 C.F.R. §§ 404.950(d) & 416.1450(d)); *see Barrett*, 906 F.3d at 342–44 (stating that plaintiff's have a qualified right to question medical

27

consultants only where it is reasonably necessary for the full presentation of a case).

Here, Plaintiff objected to the ALJ assigning any weight to Dr. Carr's opinions, requested a subpoena to cross-examine Dr. Carr, and submitted interrogatories as an alternative method to question Dr. Carr.  (doc. 11-1 at 25.)  The ALJ determined that there was "no evidence to suggest that it [was] necessary and/or relevant to further question Dr. Carr," and therefore it was "not reasonably necessary for the full presentation of the case and [was] unduly burdensome" to issue a subpoena for her.  (*Id*.)  Plaintiff "does not [specifically] argue that issuing [a] subpoena[] to the non[-]examining physician[] was necessary for the full presentation of the case."  *See Carroll*, 2001 WL 406227, at *4.  Even if Plaintiff raises that argument, the ALJ specifically determined that it was not reasonably necessary to subpoena Dr. Carr because Dr. Carr identified the medical evidence that supported her assessment, and nothing in the record suggested that she did not adhere to the requirements defined in the Program Operating Manual Systems.  (doc. 11-1 at 25-26.)  A reviewing court must defer to the ALJ's decisions.  *See Leggett*, 67 F.3d at 564.  Because there is no absolute right to subpoena non-examining physicians, and the ALJ specifically determined that cross-examination of Dr. Carr was not reasonably necessary for the full presentation of the case, Plaintiff was not denied his fundamental rights.  Accordingly, the ALJ did not err by not affording Plaintiff an opportunity to cross-examine Dr. Carr, and substantial evidence exists to support the ALJ's decision.  Remand is therefore not required on this issue.

## V.  RECOMMENDATION

The final decision of the Commissioner should be **AFFIRMED**.

**SO RECOMMENDED**, on this 4th  day of February, 2019.

_[signature: Irma Carrillo Ramirez]_

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

### INSTRUCTIONS FOR SERVICE AND
### NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law.  Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 10 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.  Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error.  *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

_[signature: Irma Carrillo Ramirez]_

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE